# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50256 | **DATE** | 7/18/2003 |
| **CASE TITLE** | | Elliott vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons stated on the attached Memorandum Opinion and Order, Plaintiff's Motion for Summary Judgment is granted and Defendant's Motion for Summary Judgment is denied. The case is remanded to the ALJ for a reconsideration of Plaintiff's RFC and with instruction to consult a vocational expert to determine whether Plaintiff is capable of performing work found in significant numbers in the national economy.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | JUL 2003 |
| | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |
| sp | courtroom deputy's initials | docketing deputy initials  7/18/2003 date mailed notice |

Document Number

U.S. DISTRICT COURT
CLERK
'03 JUL 18 PM 3:30

Date/time received in central Clerk's Office

sp
mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

DAVID ELLIOTT,                )

                            )

      Plaintiff,               )       **Case No. 02 C 50256**

                            )

      v.                   )       **Magistrate Judge**

                            )       **P. Michael Mahoney**

JO ANNE B. BARNHART,     )

**COMMISSIONER OF SOCIAL**     )

**SECURITY,**                 )

                            )

      Defendant.            )

## MEMORANDUM OPINION AND ORDER

David Elliott, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to Title II and XVI of the Social Security Act (the "Act"). 42 U.S.C. §416, 423, 1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on December 12, 2002. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB and SSI on June 14, 1999, alleging disability since October 1, 1998. (Tr. 65-67). Plaintiff's application for benefits was denied on November 1, 1999. (Tr. 49-50 ). On November 9, 1999, Plaintiff filed a request for reconsideration. (Tr. 51). Plaintiff's request for reconsideration was denied on March 15, 2000. (Tr 55-57.). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on March 24, 2000. (Tr. 58). Plaintiff appeared, with counsel, before an ALJ on January 17, 2002 . (Tr. 22). In a decision dated February 14, 2002, the ALJ found that Plaintiff was not entitled to DIB or SSI. (Tr. 18). On March 8, 2002,

Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 9). On May 31, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 7-8).

## II.   **FACTS**

Plaintiff was born January 23, 1963. (Tr. 27). He was thirty-nine years old at the time of the ALJ's decision. (Tr. 16). Plaintiff completed the eleventh grade and worked as a mechanic specializing in transmission repairs from 1984 to 1998. (Tr. 28, 77, 82). Plaintiff's most recent employment was at Master Transmissions, where he was required to lift transmissions weighing around 150 pounds. (Tr. 29).

Plaintiff testified that he stopped working on October 1, 1998 because he started acting really funny and because he could not concentrate. (Tr. 27). Plaintiff also testified that prior to October 1, 1998, he habitually missed work. (Tr. 27). When asked for the reason why he could not continue employment at Master Transmissions, Plaintiff responded that he was suffering and continues to suffer from a seizure disorder. (Tr. 30-31). According to Plaintiff, his seizures are caused by stress, sleep deprivation, exposure to bright lights, and possibly exhaust gas . (Tr. 31-32, 36). The Plaintiff testified that his former place of employment caused him stress because there was a lot of pressure to meet deadlines and because there was a lot of money involved. (Tr. 37, 41). Also, Plaintiff has become very impatient and does not take constructive criticism very well. (Tr. 40).

The frequency of Plaintiff's seizures depends on his stress level and the amount of sleep that he gets. (Tr. 36). Some weeks, Plaintiff would have two or three seizures; however, according to Plaintiff, a month could pass without any seizures. (Tr. 36). Plaintiff was first diagnosed with a seizure disorder in April or May of 1999. (Tr. 32). Plaintiff testified that he continues to have seizures despite the medication prescribed by his doctors. (Tr. 33). Plaintiff was not taking his medication on a regular basis before he became a patient of Dr. Holtan in September of 2001. (Tr.

2

40). Plaintiff also testified that since September 2001, he has experienced at least 20 seizures despite taking his medication as prescribed. (Tr. 40). When asked whether there are any side effects to the medication, Plaintiff responded that the medication makes him pretty tired. (Tr. 37).

The Plaintiff testified that he can feel a seizure coming on because he gets an electrical feeling throughout his whole body a minute or so before the onset of a seizure. (Tr.35). Based on information received from persons witnessing his seizures, Plaintiff testified that a seizure can last anywhere from one to five minutes. (Tr. 35). According to Plaintiff, the seizures have resulted in mouth cuts and broken teeth. Also, Plaintiff claims that he is very sore when he regains consciousness. (Tr. 43). Plaintiff also testified that upon regaining consciousness, he does not become fully aware of his surroundings until he lays down for about an hour. (Tr. 35).

The first seizure to be observed by another person occurred in April or May of 1999. The seizure occurred while plaintiff and his ex-wife, Kelly Elliott, were driving. Plaintiff testified that Kelly Elliott observed the seizure, pulled off to the side of the road, and flagged somebody down to call an ambulance. (Tr. 41).

The Social Security Administration requested the submission of statements by three persons who had witnessed Plaintiff have a seizure. In her July 20, 1999 statement, Kelly Elliott reported that she had witnessed her husband have up to five seizures a day. (Tr. 170-171). She explained that the seizures were manifested by dilated eyes, foaming at the mouth, and jerking movements. (Tr. 170-171). Similarly, according to July 21, 1999 statements, Plaintiff's father and step mother, Bill and Connie Elliott, also personally witnessed Plaintiff have a seizure. (Tr. 174-177). Plaintiff also testified that several friends witnessed his seizures either at his house or his brother's place of employment. (Tr. 42). Moreover, Plaintiff testified that he has had seizure activity while being treated at hospitals, once at St.Bernards Regional Medical center in Jonesboro, Arkansas, and once

at Swedish American Hospital in Rockford, Illinois. (Tr. 42, 43).

A typical day for Plaintiff consists of waking up at five o'clock in the morning, having a cup of coffee, watching the news, taking a shower, and sometimes reading a book or watching television. (Tr. 38). Plaintiff also makes trips to the grocery store. (Tr. 38). Plaintiff testified that he does continue to drive despite his seizures, but that he does so infrequently and does not drive anywhere that is too far. (Tr. 38). Plaintiff was not questioned about how far he can drive.

Plaintiff apparently did attempt to return to work at Master Transmissions in 1999. (Tr. 30). However, this attempt was unsuccessful because he began missing work again and had to discontinue his employment after two months. (Tr. 30).

## MEDICAL HISTORY

Plaintiff was born January 23, 1963. (Tr. 27). Plaintiff's height is 5 feet and 11 inches. His weight at the time of the hearing was 231 pounds. (Tr. 31).

On April 2, 1999, Plaintiff was admitted to the emergency room of Saint Anthony Medical Center in Rockford, Illinois. Plaintiff complained of chest pain brought on by stress. An EKG was negative. (Tr. 311-312).

On May 25, 1999, Plaintiff was admitted to the emergency room of the Regional Medical Center of Northeast Arkansas ("RMC"), Jonesboro, Arkansas. (Tr. 109). Plaintiff indicated he experienced a seizure while driving. (Tr. 109). A CT scan was unremarkable. (Tr. 110). Plaintiff was prescribed 250 milligrams of Depakote[1] three times a day, and was advised to follow up with a

---

[1]Depakote is an anticonvulsant used in absence seizures and related seizure disorders. STEDMAN'S MEDICAL DICTIONARY 513 (26th ed. 1995).

neurologist for an EEG[2] and further work up. (Tr. 115-116). A urine screen for drugs of abuse was negative. (Tr. 111).

On June 3, 1999, Plaintiff was again admitted to the emergency room of the RMC. (Tr. 103). Plaintiff complained of having 9 seizures within the 10 days prior to the emergency room visit. (Tr. 103). Plaintiff was prescribed Ativan[3], and he was instructed to continue taking the medication and to follow up with a neurologist. (Tr. 103, 107).

On June 8, 1999, Plaintiff began treatment with Dr. Vonda Houchin, M.D., at the Harrisburg Family Medical Center, Harrisburg, Arkansas. Plaintiff reported that he had experienced seizures for the past 7 to 8 years, but that they had become more frequent in the last couple of months. (Tr. 136). Plaintiff also stated that these seizures are manifested by body jerking and twitching, tongue biting, and eyes rolling. (Tr. 136). Dr. Houchin's medical impression was a seizure disorder. (Tr. 137). A test of Plaintiff's Depakote level revealed that it was in the therapeutic range. (Tr. 140).

On June 14, 1999, Plaintiff was admitted to the emergency room at Saint Bernards Regional Medical Center in Jonesboro, Arkansas. Plaintiff complained of having two seizures earlier that afternoon. (Tr. 126). Plaintiff reported that he had failed to take two doses of the prescribed Depakote that morning and a test of his Depakote level revealed that it was below the therapeutic range. (Tr. 126, 128). Plaintiff also underwent an EEG. (Tr.135). Results were negative, but it was noted that one negative EEG does not rule out a seizure disorder, and that if a seizure disorder is a serious concern, a sleep deprived EEG may be helpful. (Tr. 135). A June 18, 1999 lab result

---

[2] An EEG is the registration of the electrical potential of the brain derived from electrodes attached to the scalp. STEDMAN'S MEDICAL DICTIONARY 552 (26th ed. 1995).

[3] Ativan is an antianxiety drug of the benzodiazepine group. STEDMAN'S MEDICAL DICTIONARY 996 (26th ed. 1995).

confirmed that Plaintiff's Depakote level was in the therapeutic range. (Tr. 144).

On June 22, 1999, Plaintiff returned to Dr. Houchin for a follow-up examination.(Tr. 145). Plaintiff reported that he had experienced four seizures since his June 14 emergency room visit. (Tr. 145). Plaintiff also reported that he had forgotten to take his medication one night. (Tr. 145). Dr. Houchin's medical impression was a seizure disorder and a lumbar strain. (Tr. 146).

On June 28, 1999, Plaintiff was admitted to emergency room at Saint Bernards Regional Medical Center. (Tr. 119). Plaintiff complained of 3 seizures in the past hour. (Tr. 119). The seizures were characterized as starting with a blank stare, then generalized jerking, then lip smacking and choking, then generalized jerking again. (Tr. 120). Plaintiff's Depakote level was in the therapeutic range, and he was advised to continue his medication and follow up with his primary physician. (Tr. 120-121).

On July 29, 1999, Plaintiff's primary physician, Dr. Houchin, completed a Treating Physician's Report for Seizure Disorder. (Tr. 178). Dr. Houchin indicated that Plaintiff reported having seizures on a weekly basis. (Tr. 178). The report further indicated that tongue biting, loss of consciousness, alteration of awareness, postictal antisocial behavior, and convulsion are conditions that typically occur with the seizures. (Tr. 178). However, Dr. Houchin indicated that she never personally witnessed any of plaintiff's seizures. (Tr. 178). According to the report, Plaintiff first started taking medication for seizures in May of 1999, and that the medication was subsequently adjusted on June 14, 1999. (Tr. 178). Furthermore, Dr. Houchin reported that the result of Plaintiff's EEGs were normal, but noted that the EEGs were not sleep deprived. (Tr. 178).

On August 21, 1999, The police found Plaintiff lying in a ditch and brought him to the emergency room at Lawrence Memorial Hospital, Walnut Ridge, Arkansas. The diagnosis was a possible seizure. (Tr. 151). Plaintiff denied missing any doses of his medication. (Tr. 151). The

emergency room doctor advised Plaintiff to continue with his medication and follow up with his primary physician. (Tr. 154). A new prescription for Depakote was authorized by Dr. Houchin on August 3, 1999. (Tr. 156).

In a letter dated September, 10, 1999, Dr. Houchin reported that Plaintiff was currently on seizure medication, that even though an EEG was negative, Plaintiff's seizures were witnessed and recorded by emergency room physicians, and that due to Plaintiff's inability to work and lack of insurance or finances, he was not able to see a neurologist. (Tr. 158). This letter is marked as internal correspondence and is addressed to whom it may concern. (Tr. 158).

On September 29, 1999, the Arkansas Disability Determination Services for Social Security Administration conducted a Depakote test. The test revealed that Plaintiff's Depakote level was in the therapeutic range. (Tr. 159-160).

On October 18, 1999, Plaintiff underwent a medical evaluation at the Crusader Clinic in Rockford, Illinois. (Tr. 263-264). The progress report indicates that Plaintiff's EEGs have always been negative and that his symptoms of seizures have followed anxiety attacks. (Tr. 263). The report also reveals that Plaintiff has had severe marital problems. Plaintiff reported that his wife had some psychiatric disorder and that she beat him up. (Tr. 263). Plaintiff was advised to refer to a neurologist, and also a psychiatrist for further evaluation of his depression. (Tr. 264). A test of Plaintiff's Depakote level was in the therapeutic range. (Tr. 266).

On October, 24, 1999, Plaintiff was admitted to the emergency room of Swedish American Hospital in Rockford, Illinois. (Tr. 183). Plaintiff was brought to the emergency room by ambulance. (Tr. 183). According to Plaintiff, this was the first seizure in two months. (Tr. 183). Plaintiff also reported that he had been pretty consistent with his Depakote medication. (Tr. 183). A test of Plaintiff's Depakote level was in the therapeutic range. (Tr. 183). Plaintiff was advised to continue

taking his Depakote and that a second anticonvulsant may be needed, but this determination was left to the discretion of Plaintiff's primary physician. (Tr. 184).

On October 27, 1999, Dr. Steve Owen, M.D., at the request of the Social Security Administration, completed a Physical Residual Functional Capacity Assessment. (Tr. 162-169). The report indicated that Plaintiff had no exertional limitations, but that Plaintiff should not climb ladders, ropes, or scaffolds. (Tr. 162-169).

On November 3, 1999, Plaintiff was admitted to the emergency room of Swedish American Hospital. (Tr. 193-194). The police brought Plaintiff to the emergency room after witnessing his seizure. (Tr. 193). The Plaintiff told doctors that he thought about taking an overdose of his pills. (Tr. 193). Plaintiff apparently did not take an overdose of the Depakote medication, but he did admit he was depressed. (Tr. 193). Plaintiff also told doctors that he was not taking Depakote regularly. (Tr. 191). A test of Plaintiff's Depakote level revealed that it was below the therapeutic range. (Tr. 193). The medical impression of Plaintiff's condition was an acute exacerbation of a seizure disorder, subtherapeutic anticonvulsant levels, and a situational depression (not suicidal). (Tr. 194). Doctors gave Plaintiff Ativan and a higher dose of Depakote to prevent any seizures. (Tr. 193).

On November, 17, 1999, Plaintiff was again admitted to the emergency room at Swedish American Hospital. (Tr. 206-208). Plaintiff complained of anxiety, headache, and dizziness. (Tr. 206). The medical impression was that Plaintiff did not have a seizure, and that his symptoms were anxiety driven.(Tr. 207). A test of Plaintiff's Depakote level was in the therapeutic range. (Tr. 206). An EKG was also normal. (Tr. 206, 208).

On October 25, 2000, at the request of the Disability Determination Services, Plaintiff was examined by Dr. Gerald Hoffman, M.D., F.A.P.A, a psychiatrist in Belvidere, Illinois. (Tr. 287-288). Plaintiff told Dr. Hoffman that he had been taking 1000 milligrams of Depakote per day and that

there was a decrease in seizures to twice a month. However, Plaintiff also related that he was at the time only taking 500 milligrams per day because he needed to conserve the little amount he had left. (Tr. 288). Dr. Hoffman described Plaintiff as "irritable" and "cantankerous" when defending his belief that he was unable to work due to his epilepsy. (Tr. 287). Plaintiff also told Dr. Hoffman that he could probably learn how to type or do some kind of office work. (Tr. 287). Dr Hoffman's conclusion was that Plaintiff's diagnoses and treatment of a seizure disorder was unclear, and that Plaintiff seemed to be using the seizure symptoms "as a solution to a problem in living." (Tr. 288).

On September 4, 2001, Plaintiff was admitted to the emergency room of St. Anthony Medical Center in Rockford, Illinois. (Tr. 305). Plaintiff complained of a seizure earlier that morning. (Tr. 305). He also reported that he had been out of Depakote for five months. (Tr. 305). Plaintiff was prescribed Depakote, but he refused further laboratory work-up. (Tr. 306).

On September 10, 2001, Plaintiff was treated for three mild seizures by Dr. James Phoenix, M.D. at the St. Anthony Medical Center in Rockford, Illinois. (Tr. 324). Plaintiff indicated that he had stopped taking his medication for a few months. (Tr. 324). A test of Plaintiff's Depakote level was in the therapeutic range, and Dr. Phoenix prescribed 250 milligrams of Depakote five times a day. (Tr. 324).

On September 24, 2001, Plaintiff was examined by Dr. John Holtan, M.D., as a follow up from Plaintiff's September 4, 2001 emergency room visit. (Tr. 329). Plaintiff reported that he had not had a seizure since his last emergency room visit. (Tr. 329). Plaintiff was advised to work on his diet and exercise, and to try to stop smoking. (Tr. 329).

III.  **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the

9

proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather

than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision."

*Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[4] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national

---

[4]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

11

economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[5] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the

---

[5]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.   ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on February 14, 2002. (Tr. 14).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffered from a seizure disorder. (Tr. 15).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.   Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 14). The ALJ found that while Plaintiff was diagnosed with a seizure disorder, such diagnosis has not

14

been confirmed by EEG, nor does Plaintiff, when compliant with medication, manifest a pattern

of seizure frequency that satisfies the criteria set forth at sections 11.02 (grand mal epilepsy) and

11.03 (petit mal epilepsy) of the listings. (Tr. 14).

Disability is found under Listing 11.02 when there is evidence of

> Major motor seizures (grand mal or psychomotor), documented by
> EEG and by detailed description of a typical seizure pattern,
> including all associated phenomena; occurring more frequently than
> once a month, in spite of at least 3 months of prescribed treatment.
> With
> A. Daytime episodes (loss of consciousness and convulsive seizures)
> or
> B. Nocturnal episodes manifesting residuals which interfere
> significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02. Disability is also found under listing 11.03 when there

is evidence of

> Minor motor seizures (petit mal, psychomotor, or focal, documented
> by EEG and by detailed description of a typical seizure pattern,
> including all associated phenomena; occurring more frequently than
> once weekly in spite of at least 3 months of prescribed treatment.
> With alteration of awareness or loss of consciousness and transient
> postictal manifestations of unconventional behavior or significant
> interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.03. Moreover, 20 C.F.R Pt. 404, Subpt. P, App. 1, § 11.00A

provides that documentation of epilepsy should include at least one electroencephalogram (EEG).

Despite the unambiguous language in sections 11.00A, 11.02, and 11.03 of the listings,

requiring documentation of epilepsy by EEG, Plaintiff claims that the absence from the record of

an abnormal EEG does not preclude him from being presumptively disabled under sections 11.02

or 11.03 of the listings. (Pl. Br. 12-13). Plaintiff cites *Deuter v. Schweiker,* 586 F. Supp. 1414, 1420

(N.D. Ill. 1983), to support his position. (noting that the apparent intention of the language in the

Appendix, that documentation of epilepsy "should" include an EEG, is not absolutely to require an

abnormal EEG to support a finding of epilepsy. If it were, it would be medically invalid, since not all persons who have seizures also have abnormal EEGs).

However, *Deuter* is distinguishable. In the instant case, the ALJ found that Plaintiff does suffer from a severe impairment, but that Plaintiff does not meet the 11.02 or 11.03 listings because of the absence of an abnormal EEG. (Tr. 14-15). In *Deuter*, disability benefits were denied at step two of the analysis because the ALJ found that Deuter did not have a severe impairment. 586 F. Supp. at 1418. The court reversed the ALJ's decision because it was apparent from the record that Deuter did have a severe impairment, and remanded for a determination of whether the impairment met or equaled a listed impairment in the Appendix, and if not, whether Deuter was capable of performing her past work or any other work in the national economy despite her impairment. (*Id.*). Thus, in *Deuter*, a determination of whether Deuter met the 11.02 or 11.03 listings was never reached. (*Id.*). The court's statement that an EEG was not required to support a finding of epilepsy was only a directive to the ALJ on remand.

The finding in *Deuter*, that listings 11.02 and 11.03 do not require documentation by EEG, is contradicted by *Robinson v. Bowen*, No. 86-7959, 1987 U.S. Dist. LEXIS 5618, at * 2-3 (N.D. Ill. June 24, 1987) (holding that while a claimant with a normal EEG may demonstrate eligibility for disability benefits by showing that he or she is unable to engage in any substantial gainful activity, an abnormal EEG is required for purposes of the listings to conclusively presume that a claimant is entitled to benefits).[6]

---

[6]It should be noted that district court decisions are not binding upon this court. *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995) (holding that district court decisions have no weight as precedents); *Bank of America v. Moglia*, No. 25-2517, 2003 U.S. App. LEXIS 10913, at *19 (7th. Cir. June 2, 2003) (district court decisions cannot be treated as authoritative on issues of law.)

*Deuter* is also contradicted by Social Security Ruling 87-6. SSR 87-6[7] provides that documentation of epilepsy must include at least one EEG in order to meet the listings criteria. Social Security rulings offer interpretative guidance to Agency adjudicators. *Laurel v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). Social Security Rulings "are binding on all components of the Social Security Administration". 20 C.F.R. 402.35(b)(1).

Plaintiff underwent an EGG on June 14, July 29, and September 10 1999. (Tr. 135, 158, 178) All three were negative. (*Id.*). According to Social Security Ruling 87-6, documentation of epilepsy must be supported by at least one EEG. Therefore, the record substantiates the ALJ's finding that the Plaintiff's seizure disorder does not meet the criteria set forth in sections 11.02 and 11.03 of the listings.

The ALJ also found that Plaintiff does not qualify for presumptive disability because, when compliant with medication, Plaintiff did not manifest a pattern of seizure frequency that satisfies the criteria set forth in sections 11.02 and 11.03 of the listings. (Tr. 14). Section 11.02 requires seizures occurring more frequently than once a month despite three months of prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02. Section 11.03 requires seizures occurring more frequently than once weekly despite 3 months of prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.03.

There is substantial evidence in the record to support the ALJ's decision. Plaintiff was first prescribed Depakote on May 25, 1999. (Tr. 109). On June 3, 1999, Plaintiff complained of having 9 seizures in 10 days. (Tr. 103). On June 8, 1999, Plaintiff Depakote level was in the therapeutic range. (Tr. 140). This was the only time period during which seizures occurred with the frequency

---

[7]Available at: http://www.ssa.gov/OP-Home/rulings/di/o1/SSR87-06-di-01.html (last visited June 11, 2003).

required in sections 11.02 and 11.03 of the listings. However, this frequency did not occur despite three months of prescribed treatment. On June 14, 1999, Plaintiff admitted that he failed to take two doses of the prescribed Depakote and a test of his Depakote level revealed that it was below the therapeutic range. (Tr. 126, 128). On June 22, 1999, Plaintiff reported experiencing four seizures since June 14, but he also admitted that he had forgotten ta take his medication one night. (Tr. 145). On the whole, the record reveals that Plaintiff was not complying with the prescribed treatment from May 25, 1999 to June 22, 1999, the time period during which Plaintiff was having seizures at the frequency required by sections 11.02 and 11.03 of the listings.

On October 24, 1999, Plaintiff was admitted to the emergency room for treatment of a seizure. (Tr. 183). According to Plaintiff, that was the first seizure he had experienced in two months. (Tr. 126, 128). Plaintiff reported that he had been pretty consistent with his Depakote medication. (Tr. 183). Tests of Plaintiff's Depakote level on September 29, October 18, and October 24, 1999 were in the therapeutic range. (Tr. 159-160, 183, 266). However, On November 3, 1999, Plaintiff was admitted to the emergency room to be treated for a seizure. (Tr. 193-194). Plaintiff told doctors that he was not taking Depakote regularly and a test of his Depakote level was below the therapeutic range. (Tr. 191, 193). The medical evidence shows that when Plaintiff complied with his prescribed treatment, as he did between the end of August 1999 and November 3, 1999, he did not have seizures more than once a month. Therefore, the ALJ's finding that Plaintiff's seizure activity decreased when his Depakote levels were satisfactory is substantiated by the record. (Tr. 15).

Furthermore, Plaintiff did not seek treatment from November 3, 1999 to September 4, 2001.[8]

---

[8]One exception is November 17, 1999, when doctors concluded that Plaintiff did not have a seizure and that his symptoms were anxiety driven. (Tr. 207).

According to Social Security Ruling 87-6, a claimant's impairment cannot be found to meet or equal the listings in the absence of an ongoing treatment relationship. SSR-87-6.[9] Social Security Rulings "are binding on all components of the Social Security Administration". 20 C.F.R. 402.35(b)(1). Since Plaintiff did not have an ongoing treatment relationship for a period close to two years, he cannot qualify for presumptive disability under either section 11.02 or 11.03 of the listings.

In sum, substantial evidence exists in the record to support the ALJ's finding that Plaintiff's impairment does not meet or equal an impairment in the Commissioner's listings of impairments. Therefore, the ALJ's determination as to step three of the analysis is affirmed.

D.      Step Four:  Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of his past relevant work. (Tr. 16). The ALJ found that Plaintiff's Residual Functional Capacity ("RFC") precluded the following work related activities: lifting more than 20 pounds occasionally or 10 pounds frequently; and performing work around unprotected heights. (Tr. 14). Since Plaintiff's least demanding past relevant job required him to perform work activities inconsistent with his RFC, the ALJ found that Plaintiff cannot perform any past relevant work. (Tr. 16).

The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.      Step Five:  Is the claimant capable of performing any work existing in substantial numbers

---

[9]Available at: http://www.ssa.gov/OP-Home/rulings/di/o1/SSR87-06-di-01.html (last visited June 11, 2003).

in the national economy?

At Step Five, the ALJ determined that although Plaintiff's RFC did not allow him to perform the full range of light work, there existed a significant number of jobs in the national economy that he can perform. (Tr. 16).

The ALJ found that Plaintiff's RFC precludes Plaintiff from performing work-related activities that involve lifting more than 20 pounds occasionally or 10 pounds frequently, or performing work around unprotected heights. (Tr. 14). The ALJ found that the medical evidence does not support a greater finding of disabling limitations. (Tr. 15). First, the ALJ notes that Plaintiff's CT and EEG studies were negative and that his seizure activity decreased when his Depakote levels were satisfactory. (*Id.*). Second, the ALJ downplayed Plaintiff's allegation of disabling limitations by noting that Plaintiff's seizures followed anxiety attacks. (*Id.*). The ALJ also relied on Dr. Hoffman's opinion that Plaintiff is using the seizure symptoms "as a solution to a problem in living". (*Id.*).

In addition to the objective medical evidence, the ALJ also considered the factors described in 20 C.F.R. §§ 404.1529(c)(3) to arrive at the conclusion that the Plaintiff's RFC is justified. (*Id.*). Specifically, the ALJ pointed to Plaintiff's daily activities, which include playing pool, repairing appliances, and yard work, and Plaintiff's admission that he does not have a problem driving. (*Id.*).

In determining the intensity or severity of the Plaintiff's symptoms, the ALJ must consider the information submitted by the Plaintiff, the treating or examining physician or psychologist, or other persons about the Plaintiff's pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3). "[Plaintiff's] symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other

20

evidence." 20 C.F.R. §§ 404.1529(c)(4).

The ALJ failed to give due consideration to Dr. Houchin's Treating Physician Report for Seizure Disorder. "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. APFEL*, 227 F.3D 863, 870 (7th. Cir. 2000).[10]

On July 29, 1999, Dr. Houchin reported that Plaintiff was experiencing seizures on a weekly basis. (Tr. 178). Dr. Houchin also indicated that tongue biting, loss of consciousness, alteration of awareness, postictal antisocial behavior, and convulsion were conditions that typically occurred with Plaintiff's seizures. (*Id.*). Dr. Houchin's report also reveals that Plaintiff was prescribed Depakote as treatment for the seizure disorder. (*Id.*). Furthermore, in a letter dated September 10, 1999, Dr. Houchin wrote:

> [Plaintiff] is currently on seizure medication. He has a negative EEG, but his seizures have been witnessed and recorded by ER physicians. He loses consciousness and currently has been unable to work. Unfortunately, due to his lack of insurance and/or finances, we have been unable to get him in to see a neurologist.

---

[10]There appears to be some conflict in the Seventh Circuit on the weight a treating physician should receive in determining whether an individual is disabled or not. Compare *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)(stating "the ALJ properly noted that more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances."); *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000)(stating "A physician's opinion regarding the nature of severity of an impairment will be given controlling weight if it is well supported by the medically acceptable ... techniques."), with *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003)(stating "physicians naturally tend to support their patients' disability claims, and so we have warned against 'the biases that a treating physician may bring to the disability evaluation.'")(citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)(explaining that "the patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.")

(Tr. 158). Dr. Houchin's opinion is well supported by the medical evidence. Plaintiff was admitted nine times to various emergency rooms to be treated for seizures. (Tr. 103, 111, 126, 119, 151, 183, 193, 206, 305). Plaintiff was also prescribed Depakote and Ativan as treatment for the seizures. (Tr. 103, 110, 156, 193, 306, 324).

Dr. Houchin's opinion is also consistent with statements submitted by Kelly Elliott, the Plaintiff's ex-wife, and Bill and Connie Elliott, Plaintiff's father and step-mother. Kelly Elliott reported that she witnessed Plaintiff have up to five seizures a day. (Tr. 170). She also stated that Plaintiff's seizure symptoms include dilated eyes, body stiffening and jerking, and foaming at the mouth. (*Id.*). Bill Elliott stated that he witnessed Plaintiff have three seizures, and that after a seizure Plaintiff was very weak and could not get up. (Tr. 175). Connie Elliot stated that she witnessed one of Plaintiff's seizures. (Tr. 176). She explained that after the seizure Plaintiff looked disoriented and had trouble breathing. (Tr. 177).

Characterizing Dr. Houchin's opinion as unsupported by the documentary evidence, the ALJ gave it little weight in determining the effect that Plaintiff's seizures have on his RFC. However, as noted above, Dr. Houchin's opinion is consistent with both the medical evidence and the third-party statements made on Plaintiff's behalf. Thus, Dr. Houchin's opinion is entitled to controlling weight, and the ALJ erred in discrediting it without first adequately articulating his reasons for doing so. *Clifford*, 227 F.3D at 871 (while a treating physician's opinion may be discounted if it is internally inconsistent or inconsistent with other evidence, the ALJ must first articulate the reasons for discounting it).

The ALJ concluded that the documentary evidence lends no support to Dr. Houchin's opinion that Plaintiff is unable to work. (Tr. 15). While the ALJ did not specifically point to the evidence that is inconsistent with Dr. Houchin's medical opinion, he did put forward Plaintiff's

22

negative EEGs, his daily activities, and a psychiatric examination by Dr. Hoffman as reasons for discrediting the Plaintiff's allegations of disability. (Tr. 15). Even assuming that this evidence was also directed at discrediting Dr. Houchin's medical opinion, it would still be insufficient to create the inconsistency required to discredit the opinion of a treating physician. First, Dr. Kumar M.D., the administrator of Plaintiff's June 14, 1999 EEG, reported that a negative EEG does not rule out a seizure disorder. (Tr. 135). Also, Plaintiff has not had a sleep deprived EEG, a study that Dr. Kumar believed would be helpful in diagnosing Plaintiff's condition. (*Id.*).

Second, the recitation of Plaintiff's daily activities, which could reasonably be described as minimal, is not evidence that Plaintiff is not disabled, nor is it sufficient to discredit the opinion of Dr. Houchin. *Clifford*, 227 F.3D at 871 ("the ALJ [must] provide [an] explanation for [the] belief that [Plaintiff's] activities [are] inconsistent with [the treating physician's] opinion and [the] failure to do so constitutes error"). The ALJ failed to explain how Dr. Houchin's opinion of Plaintiff's medical condition is inconsistent with Plaintiff's daily activities.

As to Dr. Hoffman's opinion that Plaintiff is using the seizure symptoms "as a solution to a problem in living", this appears to be nothing more than a hunch with no scientific or psychiatric basis. (Tr. 288). The emergency room reports, the prescription of Depakote and Ativan, and the third-party statements are more consistent with Dr. Houchin's medical opinion than Dr. Hoffman's psychiatric evaluation.

Furthermore, even if Plaintiff's negative EEGs, daily activities, and psychiatric examination are accepted as casting some doubt on Dr. Houchin's opinion, the ALJ should have nevertheless considered all the relevant evidence, including the documented medical evidence and the third-party statements made on Plaintiff's behalf, in weighing whether Plaintiff's RFC permits him to perform work found in substantial numbers. Thus, the ALJ erred in not giving weight to evidence that would

23

support a more limited RFC. *Herron v. Shalala*, 19 F.3d 329, 333 (7th. Cir. 1994) (the ALJ may not select and discuss only that evidence that favors his ultimate conclusion).

If due consideration is given to Dr. Houchin's opinion and the third-party statements made on Plaintiff's behalf, then Plaintiff's RFC should be more limited than the exertional limitations found by the ALJ. As reported by Dr. Houchin and confirmed by the third-party statements, the symptoms or conditions that typically occur in conjunction with Plaintiff's seizures include convulsion, loss of consciousness, disorientation, and fatigue. (Tr. 170, 175-178). These conditions are sure to have an impact on the type of work that Plaintiff can perform. Therefore, the ALJ must consider what limitations, if any, these conditions have on Plaintiff's ability to work in order to determine whether Plaintiff is capable of performing any work existing in substantial numbers in the national economy.

In making his determination, the ALJ relied on the grids to arrive at the conclusion that Plaintiff is not disabled. (Tr. 16). The ALJ used Rule 202.18 as a framework for decision-making. (*Id*). This was error for two reasons. First, Rule 202.18 does not take into account the limitations on Plaintiff's ability to work due to symptoms or conditions accompanying the seizures. Thus, Rule 202.18 fails to establish whether Plaintiff is capable of performing work found in substantial numbers in the national economy. Second, Rule 202.18 applies to persons with the functional capacity to perform the full range of light work. 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2. Here, the ALJ found that Plaintiff's limitations prevent the performance of the full range of light work. (Tr. 17). Thus, Rule 202.18 cannot serve as a framework for decision-making in Plaintiff's case. The ALJ should have consulted a vocational expert to determine whether there is a substantial number of jobs in the national economy that Plaintiff could perform despite the limitations caused by Plaintiff's seizure disorder.

The Seventh Circuit has stated that while an ALJ need not address every piece of evidence, he must build an accurate an logical bridge from the evidence to his conclusion. *Clifford v. APFEL*, 227 F.3d 863, 872 (7th. Cir. 2000). In the instant case, the ALJ did not build an accurate and logical bridge from the documentary evidence to his decision to discredit the opinion of Dr. Houchin. Nor did the ALJ build an accurate and logical bridge from the documentary evidence to Plaintiff's RFC. Therefore, this Court cannot affirm the ALJ's determination as to Step Five of the Analysis.

## VII. CONCLUSION

For the reasons stated above, the Magistrate Judge orders that Plaintiff's Motion for Summary Judgment is granted and Defendant's Motion for Summary Judgment is denied. The case is remanded to the ALJ for a reconsideration of Plaintiff's RFC and with instruction to consult a vocational expert to determine whether Plaintiff is capable of performing work found in significant numbers in the national economy.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 7/18/03

25

# United States District Court
## Northern District of Illinois
### Western Division

DAVID ELLIOTT

v.

JO ANNE BARNHART

**JUDGMENT IN A CIVIL CASE**

Case Number: 02 C 50256

☐   Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■   Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's motion for summary judgment is granted. Defendant's motion for summary judgment is denied. This case is remanded to the ALJ as stated.

Michael W. Dobbins, Clerk of Court

Date: 7/18/2003

Gale L. Graeff, Deputy Clerk